IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2021

FILED
10/13/2021
Clerk of the
Appellate Courts

**STATE OF TENNESSEE v. BRYANT CHRISTOPHER MITCHELL**

**Appeal from the Criminal Court for Knox County
No. 109539   G. Scott Green, Judge**

————————————————————

**No. E2020-01689-CCA-R3-CD**

————————————————————

Bryant Christopher Mitchell, Defendant, appeals from his conviction of first degree murder, for which he received a life sentence.  On appeal, Defendant challenges the sufficiency of the evidence.  After a complete review, we determine that the evidence was sufficient to support Defendant's conviction.  Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Christopher M. Rodgers, Knoxville, Tennessee, for the appellant, Bryant Christopher Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ashley McDermott, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In December of 2016, Defendant was indicted for the November 2016 murder of seventeen-year-old Caleb Arwood in Knoxville.  The victim was pronounced dead at the scene, an alley in the Western Heights area of Knoxville.  He had sustained approximately 18 gunshot wounds.

On the night of November 12, 2016, Ashley McCarter was at Shanera Romero's apartment "in Ridgebrook" with "a lot of people," including Defendant, Shanee "Shelley"

Evans, and Aarin Heard. Ms. Romero was dating Defendant at the time. There was not necessarily a formal party going on at the apartment that night, but people were "drinking" and "hanging out." Ms. McCarter was out past her probationary curfew[1] and had a headache so she asked someone to take her home. Ms. Evans volunteered to take Ms. McCarter home. Ms. McCarter got into Ms. Evans's "silver four-door car," a Chevrolet Cobalt, with Ms. Evans, Defendant, and Mr. Heard. Instead of going to Ms. McCarter's house to drop her off, Ms. Evans drove to a nightclub called "Long Branch" on "the Strip." Ms. McCarter described it as "late" when they arrived at the club, "after 12:00." Ms. McCarter explained that the group eventually left the club, stopped "somewhere on the Strip to get something to eat[,]" and then headed back toward Ms. Romero's apartment. Ms. Evans recalled that they left "at the club's closing time" around "3:00 in the morning."

According to Ms. McCarter, on the way back to the apartment, while the car was on Jourolman Avenue, Ms. Evans "turned up the one-way" and "pulled beside a dumpster." Ms. McCarter saw a "white dude" "c[o]me to the side of the car" and talk to Defendant, who said something to the "kid" about "his money." During the conversation, Defendant and the man were both laughing. The next thing Ms. McCarter knew, Defendant "got out of the car" and "shot him twice." Ms. McCarter "couldn't really see them" but heard two gunshots. Mr. Heard also heard gunshots and "saw the body [of a white male] drop." Ms. Evans saw "[s]omebody walked through" the alley just before she "heard [two] gunshots," but she did not see exactly what happened.

Defendant got back in the car. Ms. McCarter remembered that Ms. Evans "pull[ed] out" of the alley and then Defendant told her "to go back." Ms. Evans refused to drive because she was scared. Defendant got behind the wheel of the car and drove back to the alley. Ms. McCarter saw Defendant get back out of the car. Ms. McCarter did not look but heard "a lot" of shots. Ms. Evans recalled that Defendant "shot the boy in the face until the clip was empty" and "threatened to kill everybody in the car."

Defendant got back into the car for a second time and the group drove back towards Ridgebrook. Ms. McCarter left the apartment. The next day, Ms. McCarter reported what she had seen to her probation officer, and eventually to the police. Ms. McCarter was Facebook "friends" with Defendant, whose Facebook name was "[s]omething Boss." Both Ms. McCarter and Ms. Evans saw Defendant with a gun that had an extended magazine on the night of the incident.

---

[1] Ms. McCarter was on probation in the CAPP (Community Alternatives to Prison Program) for a theft charge in November of 2016. As part of her probation, she had a 9:00 p.m. curfew, and had "to report three times a week."

Joshua King, a resident of Western Heights on Jourolman Avenue, heard two gunshots on the night the victim was killed. He stepped outside of his house to the sidewalk. Mr. King then "heard somebody hollering, [']help, I've been shot, help, I've been shot.[']" Mr. King unlocked his gate and started his car. He looked around to see if he saw anyone. He saw "a silver car [with tinted windows] pull up around coming in the hole."[2] He saw a "black male exit[] the car and [he] heard, [']oh, no, please man don't[']" before the black male fired "about 10 to 13 rounds" from "pretty much point-blank" range. A black female in the car "hollered, [']hurry, the police are going to come.[']" The black male "jumped in [the car] and they sped off." Mr. King observed all of this happen from about "a hundred yards" away. He could not tell if there was anyone else in the car. Mr. King called 911 and reported what he heard and saw.

Officer Darrell Sexton, an eighteen-year veteran with the Knoxville Police Department, was dispatched to the Western Heights community to the "Alley A" area on Jourolman Avenue "in reference to a shots fired call with a victim." When Officer Sexton arrived, he saw Officer Michael Dabolt "turn[] up the alley on the far end closest to Virginia Avenue" in front of him. Officer Sexton saw "the feet of the victim sticking out from behind the [second] dumpster." Officer Sexton approached the victim, who was "lying on his back with multiple gunshot wounds to his face." The victim "appeared to be deceased."

The medical examiner later determined the victim's cause of death was "multiple gunshot wounds." The victim was shot approximately 18 times. Some of the wounds contained gunshot residue, indicating that the victim was shot from close proximity. The medical examiner explained that the shooter would "[n]ot necessarily" have blood on their clothing because the first shot hit the victim's aorta and caused massive internal bleeding. Any subsequent wounds would not "bleed profusely" or cause "back spatter" because the victim's blood pressure likely dropped significantly after the first shot to the aorta.

While processing the scene, Officer Sexton saw an "object" that appeared to be "lying in the middle of the alley" about "[15] or 20 feet" from the victim's body. It was a cell phone. Officers also found an extended pistol magazine at the scene. The extended magazine contained 21 live cartridges and was identified as a Glock magazine. The magazine could hold a total of 33 cartridges. A total of 17 fired cartridge cases and one unfired cartridge along with two bullet fragments were found at the scene. Testing indicated that all 17 cartridges found at the crime scene were fired from the same nine-millimeter caliber firearm. Testing was unable to determine if the bullet fragments from

---

[2] Mr. King explained the hole was "where the projects go into." He later explained "other people call it the jungle." From his testimony and notations on exhibits entered into evidence at trial, it appears that he is referring to Alley A where the victim's body was found.

the autopsy were fired through the same firearm but determined they had "characteristics" that were "common to firearms manufactured by Glock."

During the initial police investigation, it was surmised that someone named "Honcho Da Boss" might be the owner of the cell phone found at the scene. Officers with the Knoxville Police Department were able to identify Defendant as "Honcho Da Boss" and discovered that he was reportedly staying at Ms. Romero's apartment. The phone contained multiple Facebook messages between Honcho Da Boss and Ms. Romero, both before and after the victim's death.

Robert Cook with the Knoxville Police Department violent crimes unit arrived at Ms. Romero's apartment on November 13 to talk to Defendant. Officer Cook and "several patrol officers" approached the apartment but there was no answer to a knock on the door. Defendant was seen jumping "out the back window" head-first. Defendant "hit the ground, did a somersault and [took off] straight down the hill." Defendant was chased down by a police dog and taken into custody by officers. He sustained a dog bite during the takedown.

Later that day, Ms. Romero gave police permission to search her apartment. Officers "found a pair of pants balled up on the foot of the bed in a quilt." Ms. Romero denied ownership of the pants and initially claimed that she did not know to whom they belonged. Later, she admitted that the pants belonged to Defendant. The black pants were "negative for the presence of blood" and contained a mixture of DNA from three individuals. The major contributor was a mixture of the DNA of Defendant and another person. The minor contributor could not be determined. The black pants tested positive for gunshot powder residue. Testing revealed that the pants were near a gun when it was fired, came in contact with a recently fired gun, and/or came into contact with recently fired ammunition components.

Defendant was transported to the police station where he refused to sign a waiver of rights. The rights form indicates Defendant was "willing to talk but not sign." It was signed by Investigator Riddle. Defendant was interviewed by Investigator Riddle. The interview was played for the jury. During the interview, Defendant admitted that he was with Ms. McCarter, Ms. Romero, and Mr. Heard at Long Branch before the victim's murder and that he left the bar in a silver car. Defendant claimed that he sold his phone two days before the victim's death.

Jordan Henderson, a member of the violence reduction team of the Knoxville Police Department, assisted in the investigation in this case. He found an album recorded by Defendant that was posted on a website called Spinrilla. He described the website as a "public website where performing artists, rappers, any kind of musician can upload their albums to be heard and downloaded for free."

After listening to the album, Officer Henderson thought two songs "possibly had some significance to this case just based upon the lyrics." The first song, "Let It Go," contained lyrics like "DA offered the n**** fifty. I must look stupider than a mother-f*****. With parole, I go to trial. No parole, they're going to mud stomp me. Nineteen, with a body charge." The second song, "Let Me Find Out" refers to being "out on bond" and a "forty Glock" with "extended mags."

Defendant did not present any proof. The jury found Defendant guilty of first degree murder. The trial court denied a motion for new trial. This appeal followed.

*Analysis*

On appeal, Defendant's sole challenge is to the sufficiency of the evidence. Defendant argues that there "were significant discrepancies in the witnesses' version of events" that "raise serious questions as to the accuracy of their testimony." Defendant also complains that there is no "scientific evidence that links [Defendant] to the magazine or the bullets" and that there was no proof he was wearing the black pants found in Ms. Romero's apartment on the night of the victim's death. The State argues that Defendant has waived the issue for failing to provide an adequate brief. In the alternative, the State argues that the jury properly resolved any factual disputes and determined that there was sufficient evidence of Defendant's guilt.

Our standard for reviewing the sufficiency of the evidence, both direct and circumstantial, is limited. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). We must afford the State "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007) (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). The determinative question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Although we review de novo the application of the law to the facts, *Jordan v. Knox Cnty.*, 213 S.W.3d 751, 763 (Tenn. 2007) (citing *State v. Thacker*, 164 S.W.3d 208, 247-48 (Tenn. 2005)), we cannot substitute our own inferences for those drawn by the factfinders at trial, *State v. Lewter*, 313 S.W.3d 745, 747-48 (Tenn. 2010). Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier

of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *Hanson*, 279 S.W.3d at 275).

Here, Defendant was charged with and convicted of first degree murder. In relevant part, first degree murder is "[a] premeditated and intentional killing of another." T.C.A. §39-13-202(a)(1). Tennessee Code Annotated §39-13-202(d) defines premeditation as:

> An act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

Identity is an essential element of any crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). Identity may be established with circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). "[T]he evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt." *Bell*, 512 S.W.3d at 198 (citing *Dorantes*, 331 S.W.3d at 380-81). The jury determines the weight to be given, and inferences to be drawn from, circumstantial evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016) (citing *Dorantes*, 331 S.W.3d 379). In resolving questions of fact, such as the identity of the

perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

While we agree with the State that Defendant's brief to this Court lacks references to the record in the argument section of the brief, the factual section of the brief contains some citations to the record. Therefore, we will address Defendant's issue. Viewed in the light most favorable to the State, the proof at trial was that Defendant rode as a passenger in Ms. Evans's silver car with Ms. Evans, Ms. McCarter and Mr. Heard on the night of the victim's death. Defendant was seen with a gun equipped with an extended magazine and exited the car in an alley. Defendant talked with someone before shooting him twice. The occupants of the car explained that Defendant shot the victim twice and then Defendant returned to the scene several minutes later and fired multiple shots at the victim, leaving him to die. Mr. King heard shots fired. He heard someone yelling for help. He then saw a black male fire 10 to 13 rounds from a point-blank range at the victim before leaving the scene in a silver car driven by a black woman. A phone connected to Defendant's Facebook account was found near the victim's body along with an extended magazine that was manufactured by Glock. Pants belonging to Defendant found at Ms. Romero's apartment the next day contained his DNA and gunshot residue. In our view, there was more than sufficient evidence to support the conviction for first degree murder. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE